# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 29, 2009

Charles R. Fulbruge III
Clerk

No. 08-40403

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ARIEL MENCHACA-CASTRUITA

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, JOLLY, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Ariel Menchaca-Castruita ("Menchaca") was convicted on one count of conspiracy to possess with intent to distribute more than 100 kilograms of marijuana and one count of possession with intent to distribute the same. Menchaca now appeals his conviction, contending that the district court committed clear error by denying his motion to suppress evidence recovered from his residence during a warrantless search. Convinced that no exigent circumstances existed to justify the officers' failure to obtain a search warrant, we vacate Menchaca's conviction and remand for further proceedings.

# I. FACTS AND PROCEEDINGS

## A.    FACTS

Early on a weekday afternoon in August 2007, a McAllen, Texas police officer was dispatched to the scene of a landlord-tenant dispute at a suburban residence.  When the officer arrived at the scene, he observed two women — Ofelia Garcia and her niece, San Juana San Miguel — standing in the driveway and crying.  Mrs. Garcia indicated that she and her husband, Tomas Garcia, were the owners of a single-family residence that they had been renting to Menchaca for almost three months.  Mrs. Garcia further explained that she, her husband, and Ms. San Miguel had intended to check on the condition of the residence because they had not heard from Menchaca for more than two months and had not received any rent payments since his lease began.

Mrs. Garcia told the officer that she had knocked on the front door several times, but, when no one answered, her husband had gone around to the side of the building, where he saw Menchaca through a bedroom window and motioned for him to open the front door.  When Menchaca opened the door, Mrs. Garcia demanded to see the condition of the house.  Reluctant to let her enter, Menchaca instead offered to pay the overdue rent immediately if she, her husband, and her niece would leave without first inspecting the home.  Mrs. Garcia refused, and she, her husband, and her niece pushed their way inside.

In the living room, Mrs. Garcia and Ms. San Miguel immediately noticed several large bundles of marijuana hidden under blankets.  When Menchaca tried to explain that the bags of marijuana were merely packages that he had intended to mail to various people, Mrs. Garcia walked outside and directed Ms. San Miguel to call the police.  At about this time, Mr. Garcia left in the car to

flag down a police officer whom he had seen passing on a nearby street. Mr. Garcia eventually found another officer who was on patrol for the McAllen School District Police.

In the meantime, Menchaca had followed the women outside and gotten down on his knees to beg them not to call the police, explaining that he had a wife and family that he needed to support. Mrs. Garcia refused, insisting that she had to notify the police of Menchaca's marijuana. Menchaca then became visibly upset and began shouting at the two women not to call the police. When they informed him that they had already alerted the police, Menchaca went back inside the house, opened the garage door, and started his truck. According to Mrs. Garcia, Menchaca then left the vehicle with a tire iron in his hand, approached her and Ms. San Miguel, and tried to hit them with that tool. Mrs. Garcia and Ms. San Miguel safely fled to a parking lot across the street, and Menchaca got into his truck and drove away. The first McAllen police officer arrived at about that time and was joined shortly thereafter by the school district officer.

After speaking with Mrs. Garcia and Ms. San Miguel, the police officer checked the front door and noticed that it had been left partially open. From where the officer stood on the doorstep, he could smell the odor of marijuana coming from inside the residence but could not see any marijuana. The officer testified that he heard no suspicious noises, or anything else to suggest that anyone might be inside the house. After announcing himself by calling out, "McAllen Police, anybody home?" and not receiving any response, the officer — without first obtaining a search warrant — pushed open the front door and entered the residence. Once inside, he discovered more than 700 pounds of

3

marijuana stashed in plastic bags in the living room and bedroom areas. The officer then notified police headquarters and reported what he had found. When police officers later checked the garage, they found a tire iron matching the description given by Mrs. Garcia.

Later that afternoon, Ms. San Miguel called the McAllen Police Department to report that Menchaca had contacted her and that he would soon be returning to the residence to collect his personal belongings. Police arrested Menchaca as he was leaving the residence.

## B.    PROCEEDINGS

### 1.    Indictment

Menchaca was charged by indictment with (1) one count of conspiracy to possess with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846 ("Count One"); and (2) one count of possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) ("Count Two").

### 2.    Motion to Suppress

Menchaca filed a motion to suppress all items found in or seized from his residence on grounds that the officers' warrantless search was unconstitutional under the Fourth Amendment. The district court held a suppression hearing, at which the government called as witnesses several of the law enforcement officers who were involved in the search at the residence, the investigation, and the subsequent arrest. At the hearing, the McAllen police officer who had first arrived on the scene testified as to his thought process when he entered the house without first obtaining a search warrant:

Q:    [Y]ou were informed there was potential of marijuana being
       in the house, is that correct?

4

A:   Yes.

Q:   Okay, and in your experience as a police officer what are the tools of the trade of marijuana dealing?

A:   Guns and people protecting their drugs.

Q:   And were you aware, had anyone informed you of whether there were any people inside the house at the time?

A:   We were not aware.

Q:   And that was one of the reasons for your concern, is that correct?

A:   Yes.

Q:   As you said earlier, for your safety and the safety of the people that were there?

A:   Yes.

Q:   Because there's potential for firearms being in there at the time?

A:   Yes.

Q:   Now, the other concerns that you also had, you just didn't know where anybody else was at the time, is that correct?

A:   Yes.

Q:   You were informed that Mr. Menchaca knew that there were police officers that were responding to that location?

A:   Yes.

Q:   And because you had some civilians there, both Ms. Garcia and Ms. San Miguel and Mr. Garcia, you wanted to protect them as well, is that correct?

A:   Yes.

Q:   And you took all these factors into consideration?

A:   Yes.

Q:   And as well as the aggravated assault that had just occurred?

A:   Yes.

Q:   And that was part of the basis as to why you entered the house?

A:   Yes, sir.

Q:   Any other bases why you entered the house?

A:   My priority was my safety and their safety. That was my main concern.

On cross-examination, the officer conceded that there had not been anything to suggest that anyone was inside the house or that there was any risk that the evidence might be lost or destroyed:

Q: [Y]ou'd been told that Mr. Menchaca had left the residence?
A: Yes.

. . .

Q: [Mrs. Garcia and Ms. San Miguel] never told you that they heard somebody else running around or doing anything inside the house?
A: No.
Q: They never gave you any indication that somebody else was inside the house?
A: No.

. . .

Q: [T]here are a lot of judges in Hidalgo County that are capable of issuing search warrants?
A: Yes.

. . .

Q: Okay. Now while you were there you didn't hear anybody running inside the house, right?
A: No.
Q: You didn't hear anybody flushing the toilet?
A: No.
Q: You didn't see any firearms whenever you looked inside the house?
A: No.
Q: And this is not a remote area or anything like that, is it?
A: No.
Q: It's not out in the country, it's in the city?
A: Yes.
Q: It's a residential area?
A: Yes.
Q: It's a subdivision with a lot of other homes?
A: Yes.

. . .

Q: And at the time that you made entry into the house and at the time that you decided to seize the marijuana you had never seen anybody else inside and you had no evidence that somebody else was inside?

A: No.

Q: Okay, so that's correct, am I right?

A: Yes.

At the conclusion of the suppression hearing, the district court held that exigent circumstances had justified the officers' warrantless search of Menchaca's residence. The court explained its reasoning as follows:

> [T]his is a stash house, a large amount of marijuana, over 700 pounds. I would not expect anybody to answer the door when somebody comes knocking when you have a house full of marijuana. To me that's no indication that there's only one person there. I mean if anything that's consistent that there may be other people there when nobody answered the door until Mr. Menchaca finally came out.
>
> [The officer] testified that in his experience with large amounts of drug[s], as had been reported to him here, that typically that is associated with weapons and/or other persons and when that was reported to him he felt a need for his safety and the safety of the other individuals at the scene that he needed to secure the premises immediately. And so that's what he did. As he approached, the door was already open. Again, the Court has no information on who opened the door and I make no findings in that regard. I'm left to speculate. I do conclude it was not the police officer, though, that opened the door. He reported that it was open when he arrived. He then smelled the marijuana and thereafter entered the premises to secure it and to secure the evidence. I think those are exigent, I find those are exigent circumstances.

### 3. Trial

Immediately following the suppression hearing, both parties stipulated to the facts introduced therein and submitted the case to the court as a bench trial,

7

with Menchaca reserving the right to appeal the denial of his motion to suppress. The court found Menchaca guilty on both counts.

### 4. Sentencing

The probation officer who compiled Menchaca's Pre-Sentence Report ("PSR") calculated Menchaca's base offense level at 26. Because the probation officer did not recommend any adjustments, Menchaca's suggested total offense level was also 26, with a criminal history category of I, indicating an advisory guidelines range of 63 to 78 months' imprisonment.

At sentencing, the district court adopted the facts and findings of the PSR but awarded Menchaca a two-level reduction for acceptance of responsibility, a two-level "safety-valve" reduction, and a two-level reduction for being a minor participant, resulting in a total offense level of 20 and a corresponding guidelines range of 33 to 41 months' imprisonment. The court sentenced Menchaca to 33 months' imprisonment on both counts to be served concurrently, followed by two three-year terms of supervised release also to be served concurrently. In addition, the court recommended that Menchaca's instant sentence run concurrently with any sentence resulting from his aggravated assault charges (related to the alleged tire iron incident) pending at the time in state court.

## II. LAW AND ANALYSIS

### A. STANDARD OF REVIEW

When we review a district court's denial of a motion to suppress, we view the facts in the light most favorable to the prevailing party, accepting the district court's factual findings unless clearly erroneous and considering all questions of law de novo.[1] "A factual finding is not clearly erroneous as long as it is plausible

---

[1] *United States v. Rico*, 51 F.3d 495, 500 (5th Cir. 1995).

in light of the record as a whole."[2] In reviewing the district court's denial of the motion, we may consider not only evidence introduced during the suppression hearing but also any additional evidence presented during the trial.[3]

## B.   SUPPRESSION OF EVIDENCE

### 1.   Applicable Law

Although presumptively *un*reasonable, an officer's warrantless entry will survive constitutional scrutiny if, *inter alia*, "exigent circumstances exist to justify the intrusion."[4] The exigent-circumstances exception applies "where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate."[5] The government bears the burden of proving the existence of exigent circumstances.[6]

"Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry."[7] As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be

---

[2] *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

[3] *Rico*, 51 F.3d at 504.

[4] *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993).

[5] *United States v. Rodea*, 102 F.3d 1401, 1404 (5th Cir. 1996) (internal quotation marks and citation omitted).

[6] *Id.* at 1405.

[7] *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc).

obtained.[8]  In evaluating whether exigent circumstances are present, we have often referred to the following non-exhaustive list of factors:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
>
> (2) the reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
>
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.[9]

"In evaluating exigency, it must be borne in mind that [courts] should consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers."[10]  "Our purpose is not to examine each act in isolation and inquire whether the officers could have acted differently."[11]  Rather, "[i]f 'reasonable minds may differ,' [we will] not second guess the judgement of

---

[8]  *Id.*; *see United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992), *cert denied*, 510 U.S. 937 (1993) (explaining that exigent circumstances are present in situations in which "officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence").

[9]  *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995).

[10]  *Blount*, 123 F.3d at 838.

[11]  *Id.*

experienced law enforcement officers concerning the risks of a particular situation."[12] As we previously explained in *United States v. Rico*:

> [I]f we conclude that the officer's beliefs [that suspects were about to depart with evidence] were *reasonable*, based on his experience, knowledge, and observations at the time, then circumstances existed that justified or even required immediate action. On the other hand, if we conclude that [the officer] was unreasonable in believing, based on those same circumstances, that the suspects were preparing to depart with contraband, then there would have been no reasonable justification or need for the agents [to engage in a warrantless search].[13]

### 2. Analysis

The government contends that exigent circumstances were present because (1) the officer was aware that an assault had occurred shortly before his arrival on the scene; (2) he had reason to believe that there was marijuana inside the residence; (3) he was unsure whether additional persons were present inside the residence; (4) he knew from experience that persons who engage in drug trafficking often carry firearms; and (5) he was concerned for his own safety as well as the safety of the bystanders. The government does not contend that the officer's warrantless entry was even partially motivated by concern for any possible destruction of evidence. According to the government, the officer acted reasonably under the circumstances when he entered and searched Menchaca's residence without waiting to obtain a search warrant.

---

[12] *Id.* (citing *United States v. Howard*, 106 F.3d 70, 76 (5th Cir. 1997)) (emphasis in original).

[13] *Rico*, 51 F.3d at 503.

In response, Menchaca contends that there were no exigent circumstances compelling the officer to search his residence without first securing a warrant. Specifically, Menchaca notes that (1) even if the alleged tire-iron assault had taken place, the officer knew that the weapon was not a firearm, the assault took place outside the residence, and Menchaca, the only suspect, was no longer at the scene, much less in the house; (2) no one had been injured; (3) the scene of the crime was secure, as there were several police officers surrounding the suburban residence in broad daylight on a weekday afternoon, in an area that was not known for a high incidence of crime; (4) there was nothing to suggest that anyone was inside the residence; (5) there was nothing to suggest that the evidence was at risk of destruction; and (6) the officer could have quickly and easily obtained a warrant, as the incident took place in a municipality on a weekday afternoon. Menchaca thus contends that the officers' failure to obtain a warrant requires that the evidence obtained from the unlawful search be suppressed.

In support of its argument, the government relies on *United States v. De Jesus-Batres*, in which the court found that exigent circumstances justified an officer's warrantless search of a residence used to detain illegal immigrants for ransom.[14] In *De Jesus-Batres*, a small group of people had agreed to smuggle illegal immigrants across the border for $1200 per person.[15] But, after collecting the initial $1200 fees and bringing the immigrants across the border, the smugglers then held the immigrants captive and demanded an additional $300

---

[14] 410 F.3d 154, 159 (5th Cir. 2005).

[15] *Id.* at 157-58

from each of the immigrants' families in exchange for the immigrants' release.[16] One of the immigrants managed to escape from the house and ran to a nearby fire station, where he alerted two police officers that other immigrants were still being held captive in the house.[17] The officers met the owner of the house standing outside the residence, and she agreed to let them search inside but claimed to have lost her key.[18] After forcing open the door, the officers discovered three immigrants bound together on the kitchen floor.[19] These immigrants told the officers that they were unsure whether there might be additional captives held elsewhere in the house.[20] Approximately 45 minutes later, one of the officers — without first obtaining a warrant — conducted a protective sweep of a detached garage unit located about 20 to 30 feet from the house.[21] While searching the unit, the officer discovered a gun in the bed of a pickup truck.[22]

In affirming the district court's ruling that exigent circumstances justified the officer's warrantless search of the garage, the court in *De Jesus-Batres* concentrated its analysis on (1) the officers' duty to ensure the safety of any other immigrants who might have been detained elsewhere in the residence, and

---

[16] *Id.* at 158.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

13

(2) the officers' uncertainty as to the scope of the ransom operation or the number of accomplices involved.[23] As the court explained,

> When the officers arrived at the house, they were told by the [immigrants] they released that they were not sure if anyone else was around. After releasing the three remaining [immigrants] from the house and searching the house and attic, [one officer] searched the garage because he did not know if additional [immigrants] or suspects were hiding there. The [immigrants] could have been injured or sick and any additional suspects could have posed a safety risk to the officers.[24]

The government's reliance on *De Jesus-Batres* is not persuasive, though, as that case is clearly distinguishable from the instant case. In *De Jesus-Batres*, the officers, after catching the smugglers by surprise in the midst of their ransom operations, were reasonably concerned not only about additional accomplices, but also about other captives who might be in danger. Indeed, the freed immigrants had specifically told the officers that there might be additional immigrants being held captive elsewhere in the house. By contrast, in the instant case, neither Mrs. Garcia nor Ms. San Miguel ever suggested to the officers that there might be additional accomplices in Menchaca's residence. If anything, the circumstances suggested just the opposite, *viz.*, that no one was in the residence and that there was no risk that the evidence might be destroyed: (1) When Menchaca fled in his truck, he knew that Mrs. Garcia had called the police, so he could have, and almost certainly would have, alerted any of his accomplices to flee with him; (2) the officers knew that Mr. Garcia had peered into the side windows of the house and had seen only Menchaca there; (3) Mrs.

---

[23] *Id.* at 159.

[24] *Id.*

14

Garcia never mentioned an accomplice, and the testimony at the suppression hearing at least suggested that Ms. San Miguel might have told the officers that there were no accomplices inside the house; (4) the front door to the residence had been left open, indicating a hasty retreat as well as an unsecured premises, inconsistent with the probability of additional occupants; and (5) there were no sounds coming from inside the residence to suggest that someone might have remained behind.

The government's references to our en banc decision in *United States v. Blount* are similarly unpersuasive.[25] In *Blount*, we affirmed the district court's ruling that exigent circumstances had justified a warrantless search in the midst of the pursuit of an armed fugitive.[26] Investigating a violent drug-trafficking ring, the officers in *Blount* had executed a search warrant at one residence and found drugs and a firearm, but had narrowly missed their prime suspect.[27] After receiving a tip from a local resident that the suspect had fled to a neighboring home, officers knocked on the door of that home and immediately heard the sound of people inside moving around quickly.[28] The officers continued to knock, and three men eventually came to the door.[29] The officers detained the men, but the fugitive, who was known to be armed, was not among them.[30] Without first

---

[25] 123 F.3d 831, 832-33 (5th Cir. 1997) (en banc).

[26] *Id.* at 832.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 833.

securing a warrant or obtaining consent from the residents, the officers entered the home through the front door and "made a protective sweep to determine whether [the fugitive] or anyone else was hiding [inside]."[31] Although the officers did not find the fugitive, they did observe a quantity of cocaine in plain view.[32] Prior to trial, the defendants filed a motion to suppress the cocaine, which the district court denied based on a finding of exigent circumstances.[33]

In affirming the district court's denial of the motion to suppress, the *Blount* court focused its analysis primarily on the danger posed by the armed fugitive and the volatile nature of the officers' investigation into a violent drug-trafficking ring in a high-crime neighborhood.[34] As the court explained, "[t]his fast-moving and unpredictable scene in a tough neighborhood infected by a violent drug-trafficking gang was simply not a case where the officers could safely set up surveillance while they awaited a search warrant."[35] The court then described the factors it found most persuasive:

> First, the officers were continuing an immediate search for a fleeing felon who had already escaped once from a large group of officers. The officers had confirmed that [the fugitive] was engaged in the sale of crack cocaine, and he was a suspect in an armed sexual assault. The officers reasonably believed that [the fugitive] was armed and dangerous, and would attempt to evade capture. It would have been virtually impossible to *covertly* secure [the residence] against [the fugitives].

---

[31] *Id.* at 834.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 838.

[35] *Id.*

16

Moreover, [the fugitive] was not the officers' sole concern. The officers reasonably believed that [the residence was] being employed by a violent criminal street gang in its cocaine trafficking operation ....

... [The officers] were looking for [the fugitive] who might well have been in the house. They had been told by a neighbor that it was his residence, and that at some point he would land there. They had been told by that neighbor that drugs were sold there. They knew that [the fugitive] sold drugs. They had reason to believe that members of a violent gang were also involved. They had reason to believe that [the residence] was the 'stash house' for the drug operation they had earlier uncovered. The fact that the residents refused to come to the door or to communicate with the officers but were heard moving around within the house added to an intense and volatile situation and — importantly — to the likelihood that significant evidence was being destroyed....

The situation also remained potentially explosive from the officers' reasonable point of view. Not only are firearms 'tools of the trade' in illegal drug trafficking, but the fugitive member of the drug conspiracy had previously been observed with a handgun, and a firearm had been found in the raid on the first house.[36]

Here, there does not appear to be any similar exigency. Unlike the officers in *Blount*, the police officers in the instant case (1) were not pursuing a fugitive, much less one known to be armed; (2) were not investigating a violent drug-trafficking ring; (3) had not heard or seen anything to suggest that Menchaca

---

[36] *Id.* at 838-39 (emphasis in original). Chief Judge Politz dissented from the holding and noted that the officers, who had surrounded the residence prior to conducting the search, had no reliable information suggesting that anyone might still be inside or that any evidence might be at risk of loss or destruction. *Id.* at 840-43 (Politz, C.J., dissenting). According to Chief Judge Politz, "[t]he officers were in a position to call in reinforcements and seek a warrant while keeping the house under surveillance, a markedly safer and, incidentally, constitutional course of action which would have obviated the need to brazenly confront the unknown in [the residence]." *Id.* at 842.

was carrying a firearm (indeed, the circumstances suggested otherwise); and (4) had not heard or seen anything to suggest that anyone was inside Menchaca's residence or that the evidence might be at risk of loss or destruction. Further, the officer's testimony during the suppression hearing indicates that Menchaca's residence, unlike the residence in *Blount*, was not located in the middle of a "tough neighborhood infected by a violent drug trafficking gang," but rather was apparently situated in the midst of a quiet residential neighborhood "with a lot of other homes."[37]

Several factors lend additional support to our conclusion that exigent circumstances were not present here. For example, "the amount of time necessary to obtain a warrant" likely would have been minimal, as the incident took place early on a weekday afternoon — as opposed to late in the evening or on a weekend when officers might not have had ready access to a magistrate.[38] And, despite the officer's testimony that he was concerned for his and the bystanders' safety, the government failed to present any evidence that the police ever searched the residence in a manner consistent with a protective sweep (as opposed to merely looking for the contraband they knew was present), *e.g.*, by looking expeditiously, with guns drawn, in closets, bathrooms, and other spaces where accomplices might be hiding.

We thus are left with an officer who arrived on the scene of a landlord/tenant altercation after the suspected assaulter had already fled and had reason to believe, based on the assault victims' reports, that there might be

---

[37] *Id.* at 848 (majority opinion).

[38] *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995). At the suppression hearing, the officer conceded that there were several judges in Hidalgo County capable of issuing the warrant.

several large bundles of marijuana just inside the ajar front door of an apparently empty residence. But, as we have previously explained, "[t]he mere presence of illegal drugs and weapons does not justify a protective sweep."[39]

*United States v. Carter*, a case from the Tenth Circuit, is instructive. The *Carter* court held that the district court had clearly erred in finding exigent circumstances when the only suspects in a drug investigation had already been arrested and there was no evidence that anyone else was inside the subject residence.[40] The police in *Carter* had been following up on a tip of drug use and stolen property when they approached the suspect's home, intending to "knock and talk" with anyone who answered the door.[41] As the officers approached the residence, however, the defendant, surveying the driveway from a video system installed in a remote garage unit, mistook the officers for thieves attempting to steal his car, and both he and his friend rushed outside to confront them.[42] When the officers identified themselves, the defendant dropped a small bag of marijuana from his pocket onto the ground.[43] The officers immediately retrieved the marijuana and detained both the defendant and his friend.[44] Shortly thereafter, the defendant's mother and her boyfriend came out of the house to

---

[39] *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001); *see United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) ("[T]he presence of drugs alone does not give rise to exigent circumstances justifying a warrantless entry and search.").

[40] 360 F.3d 1235 (10th Cir. 2004).

[41] *Id.* at 1238.

[42] *Id.*

[43] *Id.*

[44] *Id.*

see what was happening.[45] Although there was no evidence that anyone else was in the house or the garage, the officers proceeded to conduct a protective sweep of the property without first obtaining a search warrant.[46] During their sweep of the garage, the officers discovered a shotgun barrel and a small bag of methamphetamine.[47] Prior to trial, the district court denied the defendant's motion to suppress the evidence.[48]

In holding that the district court had clearly erred by finding that exigent circumstances justified the warrantless search, the Tenth Circuit acknowledged that "[o]fficers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home."[49] As the court noted, however, "[t]he risk is substantially diminished when the officers effect the arrest outside the home."[50] As the court explained:

> There was simply no evidence that destruction of evidence was likely. Indeed, *the government points to no reason to believe that other people were in the garage, or even the house.* All indications were to the contrary. Defendant and his friend charged out of the garage. Defendant's mother and her boyfriend came out of the house shortly thereafter. Who was left to tamper with the evidence?[51]

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* at 1241 (emphasis added).

Like the defendants in *Carter*, who had initially approached the officers in a "combative manner," Menchaca might have posed a threat when, prior to the officers' arrival, he attempted to assault Mrs. Garcia and Ms. San Miguel in the driveway of the residence. But, as in *Carter*, any potential threat to officers or bystanders — or to the integrity of the evidence — had evaporated well before the officers' arrival, even longer before their warrantless search. When the police in the instant case arrived on the scene, the bystanders were standing in the driveway, uninjured, and Menchaca had long since fled. And, like the officers in *Carter*, the officers in the instant case were safely outside of the subject residence and all bystanders even further removed. If anything, the officers increased the potential danger to themselves and the bystanders when they proceeded to enter the residence.

In sum, the McAllen police officer had no articulable reason to believe that someone else might be inside Menchaca's residence posing a threat to the officer or the bystanders, or that any evidence was at risk of destruction or removal. The government would have us affirm the district court's finding of exigent circumstances because (1) the officer reasonably believed that there were drugs in the home; (2) there was at least a possibility that someone else might be inside; and (3) firearms are often the "tools of the trade" for drug traffickers. But, inasmuch as these circumstances will be present in virtually every case involving a residence suspected of containing drugs, it bears emphasis that the exigent-circumstances exception is just that — an exception. There will always be some *possibility* that an unknown person might be hiding somewhere inside a residence, waiting for an opportunity to attack law enforcement officers or to destroy evidence. A finding of exigent circumstances, however, must be based

21

on more than a mere possibility; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger. Here, the totality of the circumstances falls well short of any reasonable foundation for such speculation.

## III. CONCLUSION

We hold that the district court clearly erred by finding that there were exigent circumstances justifying the warrantless search of Menchaca's residence. We therefore VACATE Menchaca's conviction and REMAND for further proceedings consistent with this opinion.