# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 18, 2022

Lyle W. Cayce
Clerk

No. 21-30450

United States of America,

*Plaintiff—Appellee*,

*versus*

Eugene Thurman,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:19-CR-398-1

Before Jones, Stewart, and Duncan, *Circuit Judges*.

Per Curiam:[*]

Eugene Thurman argues that the district court erred by 1) denying his motion to suppress based on the protective-sweep exception to the Fourth Amendment and the independent-source exception to the exclusionary rule, and 2) miscalculating his base offense level. We AFFIRM the judgment.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-30450

# I. BACKGROUND

The Monroe, Louisiana Police Department ("MPD") received a call on May 11, 2019 that someone with a "an AR rifle, or AR styled rifle, [or] long gun" was firing rounds outside the Parkview Apartments. That complex is located in an extremely high-crime area. Officers could not find the shooter or the weapon, but they found 17 spent .223 caliber rifle rounds in the parking lot and heard 15 shots while there.

Two days later, MPD received an anonymous tip that "Eugene Thurman [was] a felon . . . in possession of an assault rifle." The tipster further conveyed that Thurman was a 44-year-old black male who "live[d] [in unit 74] at Parkview Apartments with his girlfriend and her two children [and that he was] known to carry the weapon in a red bag with him." The tip did not provide enough evidence to obtain a search warrant, but officers determined that Thurman's was "a known felon[]" with a lengthy criminal history.

With that knowledge, Lieutenant Triche Passman, Corporal James Schmitz, Detective Doug Lambert, and Detective Snowberger, along with at least two other officers, went to the Parkview Apartments later on May 13th to conduct a "knock and talk." Upon arriving, they found three children playing outside unit 74, and one said that Thurman was inside with "somebody" before going to retrieve him. Thurman emerged about 20 seconds later and stood right outside of the unit with the door still ajar. Lambert detected an odor of marijuana wafting from the apartment. The encounter was recorded on police bodycams. For seven to eight minutes, police spoke to Thurman outside the apartment. During that time, a child entered the unit and then exited along with a woman. Thurman nervously denied possessing a gun. Although he denied that it was "his" apartment, Thurman admitted he "frequented" it. Thurman gave police the lessee's

name, and they attempted, without success, to contact her for permission to search the apartment. Thurman refused to approve a warrantless search.

Alarmed by Thurman's nervousness, evasive answers, and the possibility that others remained in the apartment, Passman announced that he was going to "clear the unit"[1] and Lambert told him to "[m]ake sure there [was] nobody else in there." Passman and Snowberger then entered the unit with their guns drawn and the former yelled "Monroe Police, anybody else in here?" Lambert and Schmitz remained outside. Within 30 seconds Passman observed "an AK-47 assault rifle propped up against a wall in the far corner of the back bedroom, a baggie of marijuana on the night table, and digital scales."[2] He then emerged from the hallway and instructed the officers outside to handcuff Thurman.

Passman and Snowberger returned to the doorway, but they had not yet determined that no one else was inside, so Lambert followed them to conduct a secondary sweep. Passman re-drew his sidearm and, within approximately 30 seconds, the officers searched the bathroom and both bedrooms. All three officers then exited the unit. The initial and secondary protective sweeps lasted only approximately one minute combined.

Lambert submitted a search warrant application that "requested to enter 1101 Richwood Road 2 Apt. 74 to collect any and all illegal drugs and weapons found inside the residence." The application stated, in relevant

---

[1] Passman was also prompted to conduct the sweep based on Thurman's alleged possession of a gun, especially in light of the prior shootings at the complex. He was unaware of the marijuana odor at that time.

[2] Though that was "not the gun [they] were looking for[,]" Passman determined at that point that there was sufficient ground to seek a search warrant because the gun they were seeking could have been somewhere else. Thurman later uses that to link the sweeps with the warrant. Yet, as explained below, Passman was not involved with obtaining the later-issued search warrant.

part, that "a protective sweep of the apartment was performed[]" "[d]ue to the chance of someone else being in the apartment and them being armed with a rifle[.]" But it only dedicated one sentence to describing what officers saw inside. The application further explained that officers had been unable to contact the lessee. And it critically maintained that "an odor of marijuana was detected coming from the apartment." A state court judge signed the warrant that same afternoon. The search commenced shortly afterward and lasted only 20 minutes. Officers recovered: a sandwich bag containing suspected marijuana, a digital scale, Thurman's ID card, an AK-47 Century International Model M70 AB2,[3] an AK-47 magazine containing 11 7.62 X 39 rounds, an empty Glock 40 magazine, and a brown leather case containing several 30-06 rounds.

A grand jury indicted Thurman in December 2019 as a felon possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Thurman pled not guilty and later moved to suppress all of the seized items. The magistrate judge held a hearing that featured 32 exhibits along with testimony from Passman, Schmitz, and Lambert. The magistrate judge recommended denying the motion. In doing so, she determined that the protective sweeps were invalid but that officers would have obtained a warrant anyway based on the independent-source exception to the exclusionary rule. Both parties filed objections. The district court adopted most of the magistrate judge's findings but denied suppression because the protective sweeps were constitutionally valid. Thurman entered a conditional guilty plea while reserving the right to appeal the denial of his motion to suppress.

---

[3] The AK-47 was manufactured in Minnesota and therefore traveled in interstate commerce to reach Louisiana. A weapons trace later verified that the firearm had been stolen during a December 2018 residential burglary in Baton Rouge.

The Presentence Investigation Report ("PSR") assessed a base offense level of 26 pursuant to United States Sentencing Guidelines ("USSG") § 2K2.1(a)(1) because Thurman had two prior felony convictions for controlled substance offenses.  With a total offense level of 26 and a criminal history category of V,[4] Thurman faced 100 to 125 months of imprisonment under the guidelines, but the statutory maximum was 10 years.  Thurman objected, arguing that his drug conspiracy conviction was not a controlled substance offense.  The court overruled the objection at sentencing and adopted the PSR.  The court then sentenced Thurman to 120 months of imprisonment and three years of supervised release.  Thurman timely appealed.

## II. DISCUSSION

"When reviewing a denial of a motion to suppress evidence, [this court] review[s] the district court's factual findings for clear error and its legal conclusions, including the ultimate constitutionality of the actions of law enforcement, *de novo*." *United States v. Meals*, 21 F.4th 903, 906 (5th Cir. 2021) (citation omitted) (alterations in original).  Findings of sufficient danger justifying a protective sweep are, for example, reviewed for clear error. *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001) (citation omitted).  Moreover, "facts underlying the suppression determination are reviewed in the light most favorable to the prevailing party, which in this case is the Government." *Meals*, 21 F.4th at 906 (citation omitted).  And the court may generally "affirm the district court's ruling on a motion to suppress based on any rationale supported by the record." *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (internal quotation marks and citation

---

[4] Thurman's base offense level was increased by two points pursuant to USSG § 2K2.1(b)(4) because the firearm was stolen.  But he received a three-point reduction under USSG § 3E1.1(a) and (b) for accepting responsibility.

No. 21-30450

omitted).     "Our review is particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses."  *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (citation omitted).

We address in order Thurman's challenge to the protective sweeps, the applicability of the independent-source exception, and whether the district court properly calculated Thurman's base offense level.

## A.

### I.

The district court ruled that "[t]he protective sweep conducted in Parkview Apartment No. 74 [was] constitutionally valid[]" based on the anonymous tip regarding the gun and the officers' articulated concerns about someone remaining inside.[5]     Thurman contends that "no exigent circumstances compel[ed] the entry into [his] residence for a protective sweep[]" and reasons that the court should have suppressed the evidence seized as a result of the search.  He specifically emphasizes that nothing suggested anyone else was inside, as evidenced by Passman's decision to turn his back to the unit's interior.  And, Thurman insists, officers would not have waited three minutes to conduct the sweep if they truly perceived danger.

---

[5] The magistrate judge evaluated considerations this court has held pertinent to the protective-sweep exception.  The district court, in contrast, assessed considerations related to the exigent-circumstances exception.  But the two exceptions are analytically distinct. *Compare Maryland v. Buie*, 494 U.S. 325, 334 110 S. Ct. 1093, 1098 (1990), *with Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S. Ct. 2458, 2459 (2002) (*per curiam*).  We may nonetheless "affirm . . . based on any rationale supported by the record" and will therefore evaluate the sweeps based on considerations identified by the magistrate judge. *Wise*, 877 F.3d at 215 (5th Cir. 2017) (internal quotation marks and citation omitted).

This court assesses the validity of protective sweeps by evaluating whether:

- o *First*, the officers had a legitimate law enforcement purpose for entering the dwelling;

- o *Second*, the sweep was supported by a reasonable, articulable suspicion that the area to be swept harbored an individual posing a danger to those on the scene;

- o *Third*, the sweep was no more than a cursory inspection of those spaces where a person may have been found; and

- o *Fourth*, the sweep lasted no longer than was necessary to dispel the reasonable suspicion of danger and no longer than the police were justified in remaining on the premises.

*United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005*)* (citing *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (en banc), *cert. denied* 543 U.S. 955, 125 S. Ct. 437 (2004), *abrogated in part on other grounds by Kentucky v. King*, 563 U.S. 452, 461-70, 131 S. Ct. 1849, 1857-62 (2011). In doing so, "we consider the totality of the circumstances surrounding the officers' actions." *United States v. Silva*, 865 F.3d 238, 241 (5th Cir. 2017) (*per curiam*) (citation omitted). "If reasonable minds could differ on the whether the sweep was warranted, we do not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation." *Id.* at 242 (citation omitted).

With respect to the first consideration, officers suspected that Thurman had an "assault rifle[,]" which could have fired the numerous .223 rounds in the nearby parking lot two days earlier. They had also examined Thurman's background, which includes four drug-related convictions, one conviction for fleeing arrest, and at least four other charges for allegedly beating women on various occasions. And, as explained below, the officers reasonably suspected that another person may have been hiding in the unit. Viewing that evidence in the light most favorable to the government, officers had a legitimate law enforcement purpose for entering the unit.

Regarding the second consideration, a child told Schmitz, as officers approached the unit, that "somebody[]" besides Thurman was inside,[6] and a woman and child remained in the apartment after Thurman initially exited. It was therefore reasonable to suspect that someone else could be inside, and that person could have foreseeably gotten hold of the suspected firearm. Even if these suspicions were tentative, this court has "upheld the validity of [a] protective sweep on the officers' belief even though the factual basis for the belief was disputable." *United States v. Wilson*, 306 F.3d 231, 238 (5th Cir. 2002) (citation omitted). Again, viewing these facts in the light most favorable to the government, the initial and secondary sweeps were

---

[6] The officers here did not hear noises or see movements suggesting that someone was inside. *Cf. United States v. Ibarra-Zelaya*, 465 F.3d 596, 605 (5th Cir. 2006); *United States v. Maldonado*, 472 F.3d 388, 393-94 (5th Cir. 2006). But from the child's comment, they had no way of knowing whether the child spoke of anyone else besides the woman. And this court has upheld protective sweeps based on reports that a person and a firearm were present in a residence. *See United States v. Riley*, 968 F.2d 422, 424 (5th Cir. 1992) (determining that a warrantless entry was not unreasonable where an accomplice told officers that "there was a large sum of money, a handgun, and another individual at the residence he had just left").

supported by a reasonable, articulable suspicion that unit 74 harbored an individual potentially posing a danger to officers on the scene.[7]

Disagreeing, Thurman emphasizes that Passman "blocked any entry into the apartment as he stood at the apartment's entryway with his back to the apartment's interior . . . [,]" and that he did so "for a large part of the time that [officers] stood talking with [him]." To be sure, an officer's "behavior [can] objectively reveal[] a purpose to conduct a search," which logically means that such behavior can also support or undermine the reasonableness of a protective sweep. *Florida v. Jardines*, 569 U.S. 1, 10, 133 S. Ct. 1409, 1417 (2013). But Thurman ignores Passman's conduct *during* the sweeps. For example, Passman drew his gun and announced his presence as he entered the unit to conduct the first sweep. If Passman was truly unconcerned for his safety, such measures would have been unnecessary. Further, Passman moved quickly and left the apartment quickly. During the secondary sweep, Passman again drew his sidearm and had two other officers providing backup. These actions were limited to measures appropriate to the protection of officer safety rather than an investigation for incriminating evidence. They dispel any inference that an unreasonable search was occurring.[8]

---

[7] Thurman attempts to analogize the facts here to those present in *United States v. Menchaca-Castruita*, 587 F.3d 283 (5th Cir. 2009) and *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004), where the respective courts held protective sweeps to have been invalid. But both of those decisions involved protective sweeps based principally on the presence of suspected drugs; neither involved suspicion of firearms based on anything other than officers' general association of guns with drug dealing. *Menchaca-Castruita*, 587 F.3d at 287; *Carter*, 360 F.3d at 1238. Officers here reasonably suspected the presence of a firearm even apart from Thurman's history in the drug trade.

[8] Even assuming *arguendo* that Passman was not concerned for *his* safety, such lack of concern cannot be imputed to other officers. Snowberger, for example, also entered the unit with his gun drawn, illustrating his own concerns.

No. 21-30450

Respecting the third consideration, "the area in front of the bed where the gun was seen appeared to be wide enough space for someone to have crouched down to avoid detection." And "it took the officers only a little over 30 seconds to find the weapon after the search began." Moreover, Passman "observed the baggie of marijuana in plain view on the nightstand[]" at approximately the same time as he saw the gun. This court has upheld the validity of protective sweeps under mattresses as police searched for persons potentially hiding in hollowed-out spaces. *See Silva*, 865 F.3d at 243; *United States v. Garcia-Lopez*, 809 F.3d 834, 839 (5th Cir. 2016). The much more limited sweeps here amounted to no more than cursory inspections of spaces where a person may have been found.

The fourth consideration, relating to the time consumed by the sweeps, plainly cuts against suppression. Video evidence proves these sweeps lasted no longer than one minute, i.e., no longer than necessary to dispel the reasonable suspicion of danger posed by another person and no longer than the police were justified in remaining on the premises.

Based on the totality of the circumstances viewed in the light most favorable to the government, the initial and secondary protective sweeps were constitutionally reasonable.

## II.

Even if the sweeps were invalid, the district court (and the magistrate judge) determined that, once Lambert perceived the odor of marijuana, "all of the evidence sought to be suppressed would have been discovered pursuant to an independent source[] sufficient to withstand exclusion of the evidence . . . ." Thurman, however, contends that the marijuana odor could have blown in from another apartment. He also argues that "[t]he unlawful sweep of [his] apartment unquestionably motivated the officers' decision to procure a warrant[,]" and given that connection, "the [g]overnment failed to

show that the marijuana formed an independent basis for entering the apartment, unconnected to the unlawful search."

The independent source exception to the exclusionary rule "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 579 U.S. 232, 238, 136 S. Ct. 2056, 2061 (2016) (citation omitted). To determine whether lawful searches and seizures are genuinely independent of earlier tainted ones, we must assess whether "the expurgated warrant affidavit provided probable cause for the issuance of the warrant by the magistrate judge[]" and "whether the illegal search *affected* or *motivated* the officers' decision to procure the search warrant." *United States v. Restrepo*, 966 F.2d 964, 966 (5th Cir. 1992), *cert. denied*, 506 U.S. 1049, 113 S. Ct. 968 (1993) (citing *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529 (1987) (emphasis in original)). We review determinations respecting the first consideration *de novo* and those regarding the second for clear error. *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996).

Regarding the first consideration, the search warrant contained sufficient information to justify a search without reference to anything seen during the protective sweeps. In fact, Lambert's search warrant affidavit included only a single sentence referring to anything observed during the protective sweep and only mentioned contraband observed in plain view. Similar affidavits have provided probable cause where officers had independent evidence of suspected drug activity. *See United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009). The affidavit here also stated that "[w]hile speaking with [Thurman,] an odor of marijuana was detected coming from the apartment." Lambert later testified that he could "smell it from the moment [officers] walked up to the front door[.]" The district court "accept[ed] the veracity of Lambert's testimony made under oath at the hearing, which he also made under oath before the state court judge." This

finding is therefore heavily weighted in the government's favor. *See Michalik*, 5 F.4th at 588 (citation omitted). Further, "[d]istinctive odors, detected by those qualified to know them, may alone establish probable cause." *United States v. McKeever*, 906 F.2d 129, 132 (5th Cir. 1990) (collecting cases). Thus, excluding the single sentence related to the protective sweeps, the search warrant's reference to the smell of marijuana emitting from the unit supported probable cause. *See Hassan*, 83 F.3d at 697.

The more subjective second consideration about the officers' motivation concerns "the precise nature of the information acquired during the illegal search" and "the relative probative import of this information compared to all other information known to the officers." *Restrepo*, 966 F.2d at 972. Neither the district court nor the magistrate judge made express findings regarding whether the officers were motivated to obtain the search warrant based on evidence observed during the protective sweeps. The district court did, however, adopt the magistrate judge's finding that the government satisfied the second consideration.[9]

Passman's post-sweep remarks and testimony in isolation could suggest that the sweeps motivated him to procure a search warrant. For example, Passman testified that he did not have sufficient grounds to apply for a search warrant until "[a]fter the sweep was done and the items—the marijuana, and the rifle were seen." But he took no action to obtain a warrant. On the contrary, he remained on scene and finally authorized Schmitz to procure a warrant.

---

[9] "Even where the district court has not made any factual findings, we have independently review[ed] the record to determine whether the district court's decision is supported by any reasonable review of the evidence." *United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018) (internal quotation marks and citations omitted) (alteration in original).

No. 21-30450

Schmitz was on the phone during the protective sweeps trying to contact the apartment lessee. He neither participated in the sweeps nor saw any contraband.[10] But Schmitz smelled marijuana at the premises and took Lambert along to procure the warrant. Lambert later testified that Schmitz largely told him what information to draft in the warrant application.

In sum, the record fairly shows that Schmitz catalyzed the search warrant application without ever entering the unit, and Passman's involvement in submitting a warrant application was nil. Finally, the application itself focuses on the smell of marijuana, with a mere mention of items inside the apartment. We cannot form a definite and firm conviction that the district court clearly erred by determining that the government satisfied the second consideration. *See United States v. Cabrera*, 288 F.3d 163, 168 (5th Cir. 2002) (internal quotation marks and citations omitted). The independent source doctrine thus independently would bar application of the exclusionary rule.

## B.

The PSR assigned Thurman a base offense level of 26 pursuant to USSG § 2K2.1(a)(1) because he committed the offense at issue after sustaining two felony convictions for controlled substance offenses, one of which was a conspiracy offense. Thurman's complaint about the guidelines calculation is that his prior drug conspiracy conviction should not be included because it is not a controlled substance offense within § 2K2.1. If that is correct, his base offense level was much higher than it should have been. Our precedent forecloses this contention. The reasoning behind our precedent is developed in *United States v. Kendrick*, 980 F.3d 432, 444 (5th Cir. 2020),

---

[10] Passman told Schmitz about the contraband, but it is unclear what role that played in his decision making.

No. 21-30450

*cert. denied*, 141 S. Ct. 2866 (2021) (quoting *United States v. Lightbourn*, 115 F.3d 291, 293 (5th Cir. 1997)).[11]

For the reasons stated above, we AFFIRM the conviction and sentence.

---

[11] The district court stated it would have imposed an "identical" sentence even if the guidelines range was "incorrect[.]" Thus, any error would be harmless. *See United States v. Delgado-Martinez,* 564 F.3d 750, 752-53 (5th Cir. 2009)(citations omitted).