# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-50461

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JONTE DESEAN TURNER,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CR-494-1

---

Before WILLETT and DOUGLAS, *Circuit Judges*, and MORALES, *District Judge*.[*]

DON R. WILLETT, *Circuit Judge*:

This is a Fourth Amendment suppression case. In January 2021, San Antonio police officers were dispatched to an apartment building based on two calls reporting a gunshot. Roughly one hour after the gunshot was reported, officers entered Jonte Turner's apartment and conducted a

---

[*] United States District Judge for the Southern District of Texas, sitting by designation.

No. 23-50461

protective sweep. Multiple firearms and loaded magazines were in plain view. Following the sweep, officers arrested Turner and obtained a search warrant. In the subsequent, warranted search, they seized firearms, magazines, and marijuana. Turner moved to suppress the physical evidence, claiming the sweep and warranted search violated the Fourth Amendment. The district court denied those motions, and we AFFIRM.

I

A

The underlying events were recorded on body cameras. On January 27, 2021, Officer Brian Bonenberger of the San Antonio Police Department was dispatched to an apartment complex in response to an anonymous caller reporting a gunshot and "a bunch of yelling down the stairs." He was dispatched at 6:47 p.m. and arrived at 6:52 p.m.

Upon arrival, Officer Bonenberger walked the area and did not immediately see anyone needing help. A woman walking her dog told him she lived in apartment #2206 and thought she heard a gunshot from directly above her second-floor apartment or potentially outside. Based on that information, Officer Bonenberger went to #2306, directly above #2206, but no one answered the door, and the officer heard no activity and saw no sign of disturbance. Officer Bonenberger then drove to a parking lot across from the apartment complex, wrote the findings in his incident report, and closed the call.

At 7:18 p.m., another call, by Amanda Zuniga,[1] came through reporting a shooting in progress at the same address noted in the prior

---

[1] The incident report and some of the trial transcript refer to the complainant as "Amanda." But the trial transcript elsewhere and some of the briefing refer to her as "Armada." We rely on the incident report.

2

anonymous call. The dispatch for that call was sent out as an emergency, making all officers aware the situation was serious. Officer Bonenberger requested that the dispatcher add him to the call since he had just been at the same building. He was assigned at 7:21 p.m. and arrived at 7:23 p.m.

Once he arrived, Officer Bonenberger and another officer went to #2202, Zuniga's apartment, and confirmed Zuniga made the call reporting a gunshot. There, the officers also confirmed with Zuniga that she heard what she believed to be a gunshot. Zuniga also reported she heard "some commotion and heard people leaving the next door apartment," #2204. Officer Bonenberger knocked on #2204's door, but nobody answered, and he didn't hear anything coming from inside.

Shortly before 7:24 p.m., Officer Bonenberger and the other officer returned and entered Zuniga's apartment, with her consent, to investigate a bullet hole, which Zuniga said was in the wall between her apartment and apartment #2204. One of the officers asked Zuniga if she knew who lived in #2204, and she responded, "[T]here's a black guy, his girlfriend, and a one-year-old." Zuniga reiterated that after she heard the gunshot, she heard someone running or some commotion, and people talking and going down the stairs. Shortly after, Zuniga found the bullet hole in her wall, which had not been there previously.

Officer Bonenberger inspected the bullet hole in the wall and the surrounding area of Zuniga's apartment. He observed there was a long ricochet mark on the carpet and damage where the bullet struck a computer. As a result, he believed the bullet came through the wall from #2204 and into #2202, skipped off the carpet, and struck a computer at a low angle. He added that the mark on the carpet was in line with the path of the bullet, and he found a portion of the bullet lodged in the computer case. At a later suppression hearing, Officer Bonenberger testified he believed the bullet had

either come from #2204 or from outside and through #2204. Though he acknowledged that he had no ballistics experience, could only see drywall in the hole, and did not use a pen or flashlight to confirm if the hole went through to the next apartment, he believed the bullet came from #2204, based on his experience as a police officer, reservist, and armor officer. He also testified that Zuniga told him she believed a child lived in #2204. But he admitted that, at 7:35 p.m., he told another officer "a long time" had already passed, and "there's probably no one there."

After inspecting the bullet hole, Officer Bonenberger left Zuniga's apartment and began coordinating with other officers on the scene to determine who was in #2204 and whether someone could be injured in that apartment. Due to the believed path of the bullet, the officers suspected there was a gun in #2204. The officers then positioned an armed police officer outside the front door of #2204. Officers also tried to determine which window belonged to #2204 to try to detect any movement inside the apartment and to make sure no one attempted to escape through the window.

Another officer, Officer Chad Bendele, was asked to patrol the back of the property to see if anyone was on the balconies or injured. At 7:29 p.m., while walking the perimeter of the apartment complex, Officer Bendele encountered a male individual on the phone, sitting on a bench, who identified himself as Jonte Turner. Turner stated he lived in #2204 but hadn't been inside and allowed officers to search him.

Sergeant William Roberts arrived around 7:37 or 7:38 p.m., approximately 20 minutes after Zuniga's phone call reporting a gunshot. According to protocol, officers at the scene were not permitted to take action until a supervisor (here, Sergeant Roberts) was on the scene. After being briefed, Sergeant Roberts began to clear units adjacent to #2204 at 7:39 p.m.

As Zuniga was evacuating, she commented that she hoped everything was okay next door and stated, "They have a baby in there."

At approximately 7:40 p.m., Sergeant Roberts learned Turner had a criminal history and began speaking with Turner one minute later. Turner again stated he lived in #2204, but it was his "Mom's friend's apartment." Turner then stated no one was in the apartment and told Sergeant Roberts that his apartment "was the one with the lights out." Sergeant Roberts asked if officers could search the apartment to make sure no one had broken in and started firing shots. Turner denied consent to search the apartment. Sergeant Roberts explained officers wanted to make sure no one was in the apartment who was dangerous, and Turner again stated no one was in the apartment. After Sergeant Roberts indicated the officers would get a warrant to search the apartment, Turner offered to go in the apartment to verify no one was inside, but he would not consent for officers to enter with him. Sergeant Roberts explained why that suggestion would not protect the safety of officers and other residents.

Sergeant Roberts then spoke with another sergeant to discuss options, such as a protective sweep and a warrant. They discussed the trajectory of the bullet and reiterated their belief that someone in #2204 had fired through the wall. Sergeant Roberts returned to Turner at 7:47 p.m., who again denied consent to search the apartment. Officers again searched Turner and removed his keys and a stack of money.

Sergeant Roberts and Officer Bonenberger then called Detective Mark Corn from 7:50 p.m. to 7:52 p.m. During this call, Sergeant Roberts and Detective Corn determined a protective sweep was necessary for community safety. Sergeant Roberts did not believe they could wait the estimated one hour to get a search warrant before going into #2204.

At 7:54 p.m.—more than one hour after the first anonymous call reporting a gunshot but only just over fifteen minutes after Sergeant Roberts's arrival on the scene—Sergeant Roberts used Turner's keys, which had been obtained from the officers' prior, consensual search of Turner, to enter #2204. Sergeant Roberts unlocked the door, announced police presence, and pushed the door open. Upon entering the apartment, the officers saw two pistols and loaded magazines in plain view on top of the kitchen counter, and the officers called out the presence of other firearms observed in plain view during the sweep. Officers also saw a bullet hole in the wall adjoining #2202. The officers opened closets, but not drawers or shelves, to ensure the apartment was clear. No one was found inside the apartment during the protective sweep. Officers concluded the sweep and left the apartment by 7:55 p.m. The sweep lasted a total of 99 seconds.

After Sergeant Roberts instructed everyone to leave the apartment, Officer Bendele placed Turner under arrest, and Officer Bonenberger called Detective Corn to get a search warrant. After the apartment had been cleared and before the warrant was returned, officers returned to the apartment multiple times, looking in the same closets as before and additional closets, and at 8:24 p.m., the officers continued to inspect the bullet hole through the wall.

Detective Ronald Soto obtained the search warrant, based on information from Detective Corn, and stated in the affidavit that items constituting evidence of the commission of the offense of deadly conduct, in violation of § 22.05 of the Texas Penal Code, were suspected to be inside #2204. The affidavit included the following factual summary to establish probable cause for the search warrant:

> San Antonio Police Officers responded to the listed location for a Deadly Conduct. When officers arrived at the scene, they discovered someone inside apartment #2204 shot a firearm

that went through his wall into the adjacent apartment. The bullet went into apartment #2202, where two people reside. When officers arrived, they were given a key to apartment #2204 by one of the occupants. To secure the scene, officers conducted a protective sweep of apartment #2204 and did not find anybody inside. During the protective sweep, officers discovered several firearms inside the apartment that someone potentially used to commit the crime. Officers were unable to obtain written consent to process the crime scene, and this case is under the San Antonio Police Department case number SAPD21017537.

The warrant was signed at 10:01 p.m., roughly two hours after the initial search, and Detective Soto took the warrant to the apartment complex. During the warranted search, officers found marijuana, which they seized along with five or six firearms and other items.

B

A grand jury indicted Turner on three charges: possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n); and possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).

In May 2022, Turner moved to suppress the physical evidence as fruit of the warrantless search of his apartment. In a separate motion, he further moved to suppress the evidence because the warrant relied on misstatements in the accompanying affidavit. The magistrate judge entered a report and recommendation for the district court to deny both motions to suppress, finding exigent circumstances justified the warrantless entry and protective sweep of Turner's apartment. The magistrate judge also found that Turner had not sufficiently shown the warrant affidavit included any intentional

falsehoods that merited suppression under *Franks v. Delaware*.[2] Turner objected to the report and recommendation, but the district court accepted it and denied Turner's motions without further analysis.

On March 16, 2023, pursuant to a plea agreement, Turner pleaded guilty to possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). Under the terms of the plea agreement, Turner reserved the right to appeal the denial of his motions to suppress.

On appeal, Turner argues that the physical evidence of firearms, magazines, and marijuana must be suppressed for two reasons, tracking his motions to suppress. First, he asserts that officers unlawfully entered his apartment in violation of the Fourth Amendment. Second, he argues that the warrant which was later obtained and used to search the apartment and seize evidence was based on false or misleading information and relied on unlawfully obtained evidence.

## II

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error."[3] We review the underlying factual findings of a warrantless search[4] and whether

---

[2] 438 U.S. 154 (1978).

[3] *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (quoting *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009); *see also United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012).

[4] *See Tamez v. City of San Marcos*, 118 F.3d 1085, 1094 (5th Cir. 1997).

No. 23-50461

an affiant deliberately or recklessly included a false statement in an affidavit[5] for clear error. A factual finding is clearly erroneous if we are left "with a definite and firm conviction that a mistake has been committed."[6] We review *de novo* whether facts sufficiently establish probable cause or exigent circumstances to justify a warrantless search and the reasonableness of an officer's reliance on a search warrant.[7]

We view the evidence in the light most favorable to the party that prevailed in the district court,[8] and we uphold a district court's ruling on a motion to suppress "if there is any reasonable view of the evidence to support doing so."[9] We may also affirm the denial of a suppression motion on any ground supported by the record.[10] The burden is on the proponent of a motion to suppress to prove, "by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."[11]

---

[5] *See United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008) (per curiam) ("The district court's factual finding that the affiant officer did not deliberately or recklessly include the false statement in the affidavit cannot be disturbed unless it is clearly erroneous." (citing *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003))).

[6] *Hernandez*, 670 F.3d at 620 (quoting *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010), *cert. denied*, 562 U.S. 867 (2010)).

[7] *See United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002); *Hearn*, 563 F.3d at 103; *Tamez*, 118 F.3d at 1094.

[8] *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016) (citing *Gonzalez*, 328 F.3d at 758).

[9] *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (citing *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)), *cert. denied*, 142 S. Ct. 828 (2022).

[10] *United States v. Conlan*, 786 F.3d 380, 387 (5th Cir. 2015) (citing *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)).

[11] *United States v. Daniels*, 930 F.3d 393, 400 (5th Cir. 2019) (quoting *United States v. Iraheta*, 464 F.3d 455, 460 (5th Cir. 2014)).

No. 23-50461

III

We begin with Turner's assertion that the officers violated the Fourth Amendment when they entered and searched his apartment without a warrant. But his argument fails because the officers met an exception to the warrant requirement and limited their search to a protective sweep.

A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[12] This Amendment "was intended to secure the citizen in person and property against unlawful invasion of the sanctity of his home by officers of the law."[13] At its core, the Fourth Amendment stands for "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."[14]

Accordingly, the Supreme Court has made clear "that searches and seizures inside a home without a warrant are presumptively unreasonable."[15] However, "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is

_____

[12] U.S. Const. amend. IV.

[13] *Weeks v. United States*, 232 U.S. 383, 394 (1914).

[14] *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *see also Payton v. New York*, 445 U.S. 573, 590 (1980) (finding the Fourth Amendment draws "a firm line at the entrance to the house").

[15] *Kentucky v. King*, 563 U.S. 452, 459 (2011) (cleaned up) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Lange v. California*, 594 U.S. 295, 301 (2021) (finding the Fourth Amendment "'generally requires the obtaining of a judicial warrant' before a law enforcement officer can enter a home without permission" (quoting *Riley v. California*, 573 U.S. 373, 382 (2014))).

reasonableness."[16] Indeed, the "warrant requirement is subject to certain exceptions[]"—as relevant here, for exigent circumstances.[17] Any such warrantless searches, however, must be reasonable and tailored in scope to the justification.[18] The government carries the burden to bring the search within an exception to the warrant requirement.[19]

Turner first contests the district court's finding that exigent circumstances justified the officers' warrantless search of his home. Under the exigent-circumstances exception, officers may enter a person's home without a warrant if they can show both exigent circumstances and probable cause that contraband is inside or a crime is taking place.[20]

1

To meet the first prong of the exigent-circumstances exception, the government must show that "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."[21] "An action is reasonable under

---

[16] *King*, 563 U.S. at 459 (internal quotation marks and citation omitted).

[17] *Lange*, 594 U.S. at 301 (quoting *Brigham City*, 547 U.S. at 403).

[18] *See Maryland v. Buie*, 494 U.S. 325, 334–36 (1990).

[19] *See United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011); *United States v. Blount*, 123 F.3d 831, 837–38 (5th Cir. 1997) (en banc).

[20] *United States v. Newman*, 472 F.3d 233, 236 (5th Cir. 2006); *Aguirre*, 664 F.3d at 610 (finding the exigent circumstances exception to the warrant requirement "is available only on a showing by the government that the officers' entry into the home was supported by probable cause and justified by an exigent circumstance").

[21] *King*, 563 U.S. at 460 (alteration in original) (internal quotation marks omitted) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)); *see also Daniels*, 930 F.3d at 400; *United States v. Flores-Castaneda*, 384 F. App'x 364, 367 (5th Cir. 2010) (applying the exigent-circumstances exception "where the societal costs of obtaining a warrant . . . outweigh the reasons for prior recourse to a neutral magistrate" (citation omitted)).

No. 23-50461

the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action."[22] For example, exigent circumstances may permit officers to enter a home to prevent the imminent destruction of evidence, to pursue a suspect, to protect against "immediate safety risks to officers and others,"[23] or "where firearms are present."[24]

"There is no set formula for determining when exigent circumstances will justify a warrantless entry[,]"[25] but we consider five factors:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.[26]

The second and fifth factors, "contraband [] about to be removed" and "ready destructibility of . . . contraband," weigh against the government's search of Turner's apartment, as guns are not the type of contraband that one would expect to be removed or destroyed during the

---

[22] *Brigham City*, 547 U.S. at 404 (alteration in original) (internal quotation marks and citation omitted).

[23] *Newman*, 472 F.3d at 237.

[24] *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995) (quoting *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992), *cert. denied*, 510 U.S. 936 (1993)).

[25] *Flores-Castaneda*, 384 F. App'x at 367 (citing *Blount*, 123 F.3d at 837).

[26] *Aguirre*, 664 F.3d at 611 (quoting *United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008)).

time it takes to obtain a warrant with officers stationed outside the apartment. However, the other three factors—urgency and the time to obtain a warrant, possibility of danger, and suspects' awareness "that the police are on their trail"—weigh in favor of the search.

Our caselaw supports this finding. Contrary to Turner's assertions, the district court correctly relied on *Tamez v. City of San Marcos* to find exigent circumstances existed.[27] In that case, officers responded to a "shots fired" call, "which, if accurate, necessarily involved a firearm of some sort," and a suspect, who one of the officers recognized as a target of a separate criminal investigation, walked out of the house.[28] The officers knew the suspect did not own the home.[29] The suspect testified that he told the officers no one was inside the house,[30] and the officers did not attempt to interview the person who made the "shots fired" call.[31] The officers "could not determine, without at least breaking the threshold of the doorway, whether anyone was inside," and they "had not yet located the gun used to fire the reported shots, nor had they conclusively determined that there were no shooting victims or hostages in the house."[32] As we found in *Tamez*, "[u]nder these circumstances, [the officer] could reasonably have harbored

---

[27] 118 F.3d 1085 (5th Cir. 1997).

[28] *Id.* at 1087, 1096.

[29] *Id.* at 1096.

[30] *Id.* at 1088.

[31] *Id.*

[32] *Id.* at 1096.

concern for the lives of innocent people . . . or for the lives of [his] fellow officers."[33]

Here, officers responded to *two* shots-fired calls, "which, if accurate, necessarily involved a firearm of some sort," as in *Tamez*. Officer Bonenberg went a step beyond the *Tamez* officers: He interviewed the individual who made the second call and another individual who heard gunshots; learned that three people, including Turner's girlfriend and a baby, lived in #2204; and inspected the bullet hole and trajectory of the bullet from the wall shared with #2204. The officers found Turner outside the apartment, and Turner had a criminal history and told them it was his mom's friend's apartment— not his—similar to the suspect in *Tamez*.

Turner emphasizes that Officer Bonenberger's statements that "a long time" had passed and that "there's probably no one there" show that the officers did not actually believe any person—injured or accomplice—was inside. But those statements alone do not make it *objectively* unreasonable for the officers (not just Officer Bonenberger) to still "harbor[] concern" that other people were inside the apartment.[34]

In any event, Sergeant Roberts arrived around 7:37 or 7:38 p.m., and only a about a minute later, Sergeant Roberts ordered the clearing of neighboring apartments. And about two minutes later after that, he spoke with Turner. Sergeant Roberts learned at least three facts that heightened the exigency: Turner said he hadn't been in the apartment (and, if true, Turner couldn't have known who had been inside or what had occurred to lead to the

---

[33] *Id.* Although an officer in *Tamez* leaned inside the doorway, where the door was open but the screen door was shut, *id.* at 1088, rather than conducting a full protective sweep, as the officers did here, the exigent-circumstances analysis is still relevant; the scope of the search is a different issue. *Post,* at 20–23.

[34] *Tamez*, 118 F.3d at at 1096; *see Brigham City*, 547 U.S. at 404.

No. 23-50461

reported gunshot); Turner didn't own the apartment; and Turner wanted to check on the apartment without the officers. Accordingly, the officers could reasonably discredit Turner's assertion that no one was in the apartment.

Furthermore, though Turner told the officers no one was in the apartment, the officers, like those in *Tamez*, "could not determine" "whether anyone was inside" #2204 because they "had not yet located the gun used to fire the reported shots, nor had they conclusively determined that there were no shooting victims . . . in the house." In fact, when officers struggled to determine which window belonged to #2204, Turner told Sergeant Roberts that "his was the one with the lights out." The officers had to take Turner's word for it—without a reliable way to corroborate that the darkened window did (or did not) belong to #2204. And though Zuniga heard "commotion" and people going down the stairs, there was no way of knowing there weren't *others*—perhaps Turner's girlfriend—in the apartment who were still in possession of a firearm.

Turner emphasizes two points. First, he argues that we have "consistently held that the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance."[35] True. But this case is not just about "the presence of a firearm alone."[36] Instead, a firearm was *discharged*—through a neighbor's wall, no less—when other people were present in neighboring apartments. And with multiple officers stationed around #2204 and the apartment

---

[35] *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

[36] *See United States v. Barber*, 615 F. Supp. 3d 505, 513 (E.D. Tex. 2022) ("The Fifth Circuit has 'consistently held that the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance.' But the situation here goes far beyond the mere presence of a firearm, given that an actual shooting had occurred." (quoting *Jones*, 239 F.3d at 720)).

building in the aftermath of the gunshot, the officers had reason to believe a suspect would be aware of police surveillance.

Second, Turner points to the fact that officers "did not see or hear someone inside the home."[37] But our precedents do not suggest that the exigent-circumstances exception applies *only* when officers see or hear someone inside.[38] Officers need only reasonably believe that someone is inside who could pose a security risk.[39]

_____

[37] *See, e.g.*, *Aguirre*, 664 F.3d at 611 (officers saw someone looking out the window and heard shuffling inside trailer); *Rico*, 51 F.3d at 499 (officer saw a man in the home); *United States v. Rodea*, 102 F.3d 1401, 1408 (5th Cir. 1996) (officer could hear people running inside the home); *Blount*, 123 F.3d at 838 (officers could hear people moving around inside the house who refused to come to the door); *Daniels*, 930 F.3d at 401 (officers could hear suspected drug dealers running back and forth in a motel room and the toilet flushing).

[38] *See, e.g.*, *McGeehan v. Wainwright*, 526 F.2d 397, 399 (5th Cir. 1976) (finding exigent circumstances after armed robbery occurred an hour prior, the suspects exited the trailer unarmed, the trailer was dark, and none of the suspects surrendered a weapon), *cert. denied*, 425 U.S. 997 (1976); *United States v. Mendoza-Burciaga*, 981 F.2d 192, 197 (5th Cir. 1992) (affirming district court's finding of exigent circumstances when "the officers *did not know whether other suspects were in the house*" but "did know that the suspects . . . were armed. If others were in the house and armed, the officers would be in great danger" (emphasis added)); *United States v. Silva*, 865 F.3d 238, 242 (5th Cir. 2017) (finding exigent circumstances "even though the marshals had no indication that anyone else was inside the trailer, in light of his 13 years of experience, [a marshal] believed the trailer could still contain a safety risk to the officers. Further, [another marshal], who conducted the sweep . . . testified that they conducted the sweep because they were concerned for their safety, specifically that they could not be certain that no one else was inside the trailer.").

[39] *Newman*, 472 F.3d at 237–38; *see also Rico*, 51 F.3d at 501 (recognizing exigent circumstances may exist due to "the *possibility* of danger to the police officers guarding the site of contraband while a search warrant is sought" (emphasis added)); *United States v. Stout*, 339 F. App'x 377, 378 (5th Cir. 2009) (finding protective sweep permissible where "it was possible that another individual could have been inside the home who posed a threat to the officers'[] safety").

Turner's reliance on *United States v. Menchaca-Castruita*[40] to make this argument is misplaced. There, after a landlord–tenant dispute in which the landlord found drugs inside and called the police, the tenant-defendant attempted to assault the landlord with a tire-iron and fled the scene.[41] Once the police arrived, they conducted a protective sweep and discovered 700 pounds of marijuana.[42] At the suppression hearing, the officer recounted he was concerned by the potential for firearms being present, the presence of civilians nearby, and his safety.[43] We found no exigent circumstances existed because the officer knew the defendant had left the premises, "the weapon was not a firearm," "there was nothing to suggest that anyone was inside the residence," "the officer could have quickly and easily obtained a warrant, as the incident took place in a municipality on a weekday afternoon," and no one "ever suggested to the officers that there might be additional accomplices in [the] residence."[44]

Here, unlike in *Menchaca-Castruita*, two callers reported a gunshot, thus suggesting the presence and use of a firearm. After inspecting a neighboring apartment, the officers here believed a firearm had been shot from that apartment. Although a witness heard people going down the stairs after the gunshot, she repeatedly mentioned three people, including Turner's girlfriend and a baby, lived in the apartment. Turner offered to go into the apartment, but denied consent for the officers to join him, suggesting to the officers he may have known who was inside. Accordingly, even though

---

[40] 587 F.3d 283 (5th Cir. 2009).

[41] *Id.* at 285–86.

[42] *Id.* at 286.

[43] *Id.* at 287.

[44] *Id.* at 290–92.

the officers did not hear or see anything inside #2204, the officers could "reasonably fear for their safety" as well as the safety of others.[45]

Additionally, unlike the circumstances in *Menchaca-Castruita*, "[t]here was a clear danger to officers and others in the neighborhood that the shooter could have started shooting again, a danger that would have been exacerbated by the extended timing of officers seeking out a warrant after business hours."[46] Here, officers were investigating after 7 p.m., and Sergeant Roberts expected the process of getting a warrant would take an hour (and, in fact, it took two).

Although about an hour passed between the initial report of the gunshot and the first search of Turner's apartment, we have previously found a weapon's use one hour prior to the search did not reduce the exigency of the circumstances.[47] To be clear, we do not draw any bright lines or condone all one-hour-later warrantless searches. Whether exigent circumstances exist is a fact-specific inquiry,[48] and here, the specific combination of facts suggests exigent circumstances. And while we appreciate that "reasonable minds may differ" as to whether exigent circumstances exist, when "reasonable minds may differ," we defer to the judgment of experienced law

_____

[45] *Rico*, 51 F.3d at 501 (citation omitted).

[46] *Barber*, 615 F. Supp. 3d at 513.

[47] *See Tamez*, 118 F.3d at 1096 ("In [*McGeehan*], as in this [case], police knew that a weapon had been used about an hour earlier, and none of the suspects who exited the trailer carried the weapon. We held that the police could reasonably suspect that 'additional confederates might be concealed inside the darkened trailer with the missing shotgun,' thus justifying a warrantless protective sweep of the trailer." (quoting *McGeehan*, 526 F.2d at 399)).

[48] *Newman*, 472 F.3d at 237; *United States v. Hicks*, 389 F.3d 514, 527 (5th Cir. 2004).

No. 23-50461

enforcement officers as to the danger of a particular situation.[49] We do so here.

2

Even under exigent circumstances, law enforcement must also show "probable cause that contraband is inside or that an illegal act is taking place" before entering without a warrant.[50] Probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."[51] Importantly, "[p]robable cause does not require certainty."[52]

The officers here had probable cause. There was ample reason for the officers to believe that there was an unaccounted-for firearm in #2204.[53] Although the officers could not be "certain[,]"[54] they could reasonably believe that a firearm could still be in the apartment, let alone an accomplice. The totality of the circumstances here gave the officers a "fair probability" that evidence of the crime would be found.[55] Accordingly, they had probable cause.

---

[49] *Blount*, 123 F.3d at 838 (internal quotation marks and citation omitted).

[50] *Newman*, 472 F.3d at 236.

[51] *Id.* at 237 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[52] *Waldrop*, 404 F.3d at 369–70 (quoting *United States v. Buchanan*, 70 F.3d 818, 826 (5th Cir. 1995)).

[53] *See ante*, at 14–19.

[54] *See Waldrop*, 404 F.3d at 369–70 (quoting *Buchanan*, 70 F.3d at 826).

[55] *See Newman*, 472 F.3d at 237 (citation omitted).

No. 23-50461

Because both exigent circumstances and probable cause existed, the warrantless entry into Turner's apartment did not run afoul of the Fourth Amendment.

B

We next turn to whether the officers conducted a permissible protective sweep of Turner's apartment.[56] "The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene."[57]

A protective sweep is justified where: (1) "the police [have not] entered (or remained in) the home illegally and their presence within it [is] for a legitimate law enforcement purpose;" (2) "the protective sweep [is] supported by a reasonable, articulable suspicion . . . that the area to be swept harbors an individual posing a danger to those on the scene;"[58] (3) "the legitimate protective sweep [is not] a full search but [is] no more than a cursory inspection of those spaces where a person may be found;" and (4) the duration of the protective sweep, first, "last[s] no longer than is necessary to dispel the reasonable suspicion of danger," and, second, "last[s] no longer

_____

[56] *See United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (en banc) (describing requirements for valid protective sweep), *abrogated on other grounds by King*, 563 U.S. 452.

[57] *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005).

[58] Note that this is a lower standard than the probable cause required to establish exigent circumstances. *Compare Newman*, 472 F.3d at 236 (stating that probable cause is required to enter a residence), *and Aguirre*, 664 F.3d at 610 (same), *with Buie*, 494 U.S. at 334 (holding that "officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces . . . from which an attack could be immediately launched"), *and United States v. Lozano*, No. 21-50391, 2022 WL 2187859, at *1 (5th Cir. June 17, 2022) (unpublished) ("Probable cause is not required for a protective sweep. . .").

than the police are justified in remaining on the premises."[59] An arrest is not required, so long as officers are otherwise lawfully in the home.[60]

As discussed above,[61] the officers were lawfully in Turner's apartment due to exigent circumstances and had probable cause to believe that a firearm and a potential shooter was inside. As to the scope of the sweep, the officers looked only in places where a person could be hidden—such as closets but not cupboards or drawers. The firearms and magazines were in plain view, such as on the kitchen counter or in closets that were swept.[62] Additionally, the sweep was no longer than necessary, lasting approximately one and a half minutes.[63]

Turner argues, without explanation or citation to the record, that "[t]he officers also did not limit themselves to a 'cursory inspection of those spaces where a person may be found,'" then states that "[t]he officers

---

[59] *Gould*, 364 F.3d at 587 (citations and internal quotation marks omitted).

[60] *See id.* at 581, 584, 586–87.

[61] *Ante,* at 11–20.

[62] *See Mendoza-Burciaga*, 981 F.2d at 197 ("Where officers are lawfully present in a house during a security sweep they may seize evidence in plain view." (first citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467–68 (1971); and then citing *United States v. Caraza*, 843 F.2d 432, 435 (11th Cir. 1988))).

[63] *See, e.g.*, *Buie*, 494 U.S. at 335–36 (emphasizing that the circumstances dictate whether the sweep is justified and stating that the sweep must last "*no longer than is necessary* to dispel the reasonable suspicion of danger" (emphasis added)); *id.* at 335 n.3 ("A protective sweep is without question a 'search,' as was the patdown in *Terry*; they are permissible on less than probable cause only because they are *limited* to that which is *necessary to protect* the safety of officers and others." (emphases added) (citation omitted)); *United States v. Thurman*, No. 21-30450, 2022 WL 2805147, at *5 (5th Cir. July 18, 2022) (per curiam) (finding sweep of apartment that lasted one minute was reasonable), *cert. denied*, 143 S. Ct. 750 (2023); *Silva*, 865 F.3d at 243 (finding forty-second sweep of trailer was lawful); *United States v. Hann*, 38 F.3d 570 (5th Cir. 1994) (unpublished) (finding three-minute sweep of apartment was justified).

testified that their sweep was initially compliant." Turner does not argue that any (unidentified) search of spaces where a person could not reasonably be found resulted in physical evidence he now seeks to suppress, nor could he. The only search that Turner could conceivably argue was outside the scope of the protective sweep was the officers' sweep of the areas beneath the mattresses. But even then, the body camera footage shows that the search beneath the mattress did not result in the discovery of evidence, and we have generally upheld the validity of such sweeps.[64]

As Turner notes, the officers *returned* to the apartment before getting a warrant. In these subsequent searches, officers shined flashlights into additional closets, such as one housing a washing machine and dryer, and returned to closets and rooms they had previously declared "clear" in the initial search. Even if these subsequent searches—which were no longer exigent or protective—violated the Fourth Amendment, Turner makes no argument that they provided any new evidence that Turner seeks to suppress.[65]

Because exigent circumstances permitted entry and the officers' initial search was limited to a protective sweep, we affirm the district court's

---

[64] *See Thurman*, 2022 WL 2805147, at *5 ("This court has upheld the validity of protective sweeps under mattresses as police searched for persons potentially hiding in hollowed-out spaces.").

[65] *See, e.g.*, *Chimel v. California*, 395 U.S. 752, 775 n.6 (1969) (WHITE, J., dissenting) ("Since no evidence was seized in the second search, and since it did not in any way affect petitioner's trial so far as the record discloses, there is no occasion to consider its propriety."); *United States v. $291,828.00 In U.S. Currency*, 536 F.3d 1234, 1239 (11th Cir. 2008) (finding second sweep, during which officers found physical evidence, supported by exigent circumstances); *United States v. Harris*, 642 F. App'x 713, 714–16 (9th Cir. 2016) (finding second sweep, during which officers found cocaine in plain view, unreasonable).

No. 23-50461

denial of Turner's motion to suppress based on a warrantless search of his apartment.

## IV

We next turn to Turner's second motion to suppress. Turner asserts that the physical evidence was seized pursuant to an unlawful warrant for two reasons: A) the warrant was not subject to the good-faith exception and did not show probable cause, and B) the warrant was based on unlawfully obtained evidence from the prior warrantless search. But he is incorrect on both points.

## A

"[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter."[66] So, when determining whether a search conducted pursuant to a warrant violates the Fourth Amendment, we make a "two-part inquiry."[67] First, we determine whether the search or seizure falls within the good-faith exception to the exclusionary rule.[68] The good-faith exception "provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded."[69] "[T]he initial

---

[66] *Franks*, 438 U.S. at 165.

[67] *United States v. Allen*, 625 F.3d 830, 835 (5th Cir. 2010).

[68] *See id.*

[69] *Cavazos*, 288 F.3d at 709 (citing *United States v. Leon*, 468 U.S. 897, 919–20 (1984)).

No. 23-50461

burden . . . is upon the defendant to prove that false information was given intentionally or recklessly."[70]

If the good-faith exception applies, we affirm the district court's denial of suppression of the evidence without further analysis.[71] But if the exception does *not* apply, we "proceed to the second step in the analysis and determine whether the magistrate had a substantial basis for finding probable cause."[72] "If the defendant fails to meet his burden, or if the affidavit would have sufficiently provided probable cause without the false information, the warrant did not violate the Fourth Amendment and the evidence should not [be] excluded."[73]

1

The good-faith exception does not protect warrants based on "deliberately or recklessly false" affidavits.[74] Turner asserts the affidavit supporting the search warrant contained three false or misleading statements, without which the magistrate judge could not have found probable cause: (1) "officers knew somebody shot a firearm in apartment [#]2204," (2) "Turner willingly gave them the keys to search his apartment," and (3) "firearms had been discovered that were potentially involved in crimes."

---

[70] *Id.* at 710.

[71] *See id.* at 709.

[72] *Id.*

[73] *Id.* at 710.

[74] *Leon*, 468 U.S. at 914 n.12 (quoting *Franks*, 438 U.S. at 165); *see also Cavazos*, 288 F.3d at 709 (noting that the good-faith exception applies only when "officer's reliance upon the information's truth was objectively reasonable" (citing *Leon*, 468 U.S. at 919–20)); *Davis v. United States*, 564 U.S. 229, 238 (2011) (requiring more than "isolated negligence" for evidence to be excluded (internal quotation marks and citation omitted)).

24

First, Turner argues that the affidavit was false or misleading when it said the officers "discovered someone inside apartment #2204 shot a firearm that went through his wall into the adjacent apartment." Turner contends that this statement misrepresents the officers' certainty—they did not "discover" someone in #2204 shot a firearm; they merely suspected it. Regardless of what the officers knew or believed after Officer Bonenberg's first visit to the apartment complex, the affidavit followed an inspection of #2202—which revealed a bullet hole in the wall shared with #2204, a long ricochet mark on the carpet, and damage to a computer struck by the bullet— and a protective sweep in which, undisputedly, officers found, in plain view, firearms, magazines, and a bullet hole in the wall shared between apartments #2202 and #2204. Even if officers "expressed uncertainty" and "noted their lack of expertise in ballistics," the evidence before the sweep—which was reaffirmed by the sweep—gave the officers reasonable belief that a firearm had been shot in #2204. Based on this evidence, officers reasonably believed that someone in Turner's apartment shot a bullet through the wall, so use of the word "discovered" is not "deliberately or recklessly false."[75]

Second, Turner contests the affidavit's statement that the officers "were given a key to apartment #2204 by one of the occupants" as "misleading." The officers obtained Turner's keys through a search conducted *with Turner's consent*. Furthermore, the warrant does *not* state Turner gave the key voluntarily or consented to the search of his apartment. Indeed, the warrant clearly states that Turner did not consent to officers entering his apartment or conducting a protective sweep. And even if the

_____

[75] *Leon*, 468 U.S. at 914 n.12 (citation omitted).

statement was "misleading," as Turner contends, it is not "deliberately or recklessly false."[76]

Third, Turner argues the affidavit "simply speculated about the basis for additional search" when it stated that "officers discovered several firearms inside the apartment that someone potentially used to commit the crime." Nothing about this statement—nor speculation, generally—is "deliberately or recklessly false."[77] Indeed, the protective sweep revealed multiple firearms and loaded magazines in plain view. Though the affidavit stated that they had only found firearms "*potentially* used to commit the crime," certainty is not required to establish probable cause.[78]

Even if the officers' initial entry, protective sweep, and subsequent searches violated the Fourth Amendment, we have been "open[] to applying the good faith exception where an earlier-in-time constitutional violation exists alongside a search warrant that was sought and executed in good faith."[79] None of the asserted "false" statements suggest Detective Soto had any reason to doubt the information he received from Detective Corn and used in the affidavit, or that Detective Soto actively misled the magistrate judge.[80]

Because Turner fails to prove any of the statements in the affidavit were "deliberately or recklessly false,"[81] the good-faith exception applies.

---

[76] *Id.*

[77] *Id.*

[78] *See Waldrop*, 404 F.3d at 369–70 (quoting *Buchanan*, 70 F.3d at 826).

[79] *United States v. Massi*, 761 F.3d 512, 526 (5th Cir. 2014).

[80] *See Massi*, 761 F.3d at 531 (citing *United States v. Woerner*, 709 F.3d 527, 534 (5th Cir. 2013)).

[81] *Leon*, 468 U.S. at 914 n.12 (citation omitted).

2

Though our analysis could end here,[82] the affidavit would still establish probable cause even if the good-faith exception did not apply. "If an allegation of intentional falsity or a reckless disregard for the truth is established by the defendant by a preponderance of the evidence, . . . we must then excise the offensive language from the affidavit and determine whether the remaining portion would have established the necessary probable cause."[83]

Without the asserted "false," "misleading," or "speculat[ive]" statements, the magistrate judge *still* would have had probable cause to believe evidence of the gunshot, a violation of Texas law proscribing "deadly conduct,"[84] was in the apartment. After all, the officers were investigating an unlawful discharge of a weapon with evidence that a weapon had recently been discharged from that apartment.

Begin with the statement that the officers "were given" a key to #2204 by an occupant. This fact is not material to establishing probable cause. Indeed, whether or not they were given a key has no bearing on the facts that precipitated the warrantless search under the exigent-circumstances exception and why they believed a firearm was present in the apartment.

---

[82] *See Cavazos*, 288 F.3d at 709 (finding that if the good-faith exception applies, the court may affirm the district court's denial of suppression of the evidence).

[83] *Id.* at 710 (internal quotation marks omitted) (first citing *Franks*, 438 U.S. at 156–57; and then citing *United States v. Alvarez*, 127 F.3d 372, 374 (5th Cir. 1997)); *see also United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017) (citing *Franks*, 438 U.S. at 155–56).

[84] Tex. Penal Code § 22.05.

Next, take the statements about the officers' "discover[y]" that "someone inside apartment #2204 shot a firearm that went through [its] wall into the adjacent apartment" and of firearms "potentially used to commit the crime." Even without these statements, the affidavit discusses officers' arrival at a location listed for "deadly conduct," a bullet shot into an apartment where at least two people resided, and a protective sweep, in which firearms were found. These facts alone provide probable cause.

Going a step further, and assuming that the entry and protective sweep *did* violate Turner's Fourth Amendment rights—thus removing the discovery of firearms and magazines from the affidavit—the affidavit would still establish probable cause. After responding to deadly conduct and finding a bullet hole in the wall of #2202, it is reasonable to request a search warrant for weapons.

Accordingly, even if the good-faith exception did not apply, the affidavit alleged sufficient facts to establish probable cause.

B

Turner finally asserts that because the warrant relied on unlawfully obtained evidence, the firearms and marijuana should be excluded as evidence. But because the warrantless entry into and sweep of Turner's apartment were permissible, as we discussed previously,[85] the warrant was based on lawfully obtained evidence.

We have recognized that warrants that rely on unlawfully obtained evidence implicate the seemingly conflicting "good-faith exception" and "fruit of the poisonous tree" doctrine.[86] In such cases, two "separate

---

[85] *Ante*, at 11–23.

[86] *Massi*, 761 F.3d at 527.

requirements must be met for evidence to be admissible."[87] First, the prior unlawful conduct that produced the evidence in the affidavit must be "close enough to the line of validity that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct."[88] Second, the "resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*."[89]

The entry and search at issue here meet both requirements. First, the protective sweep which revealed the firearms and magazines in "plain view" was lawful.[90] Even if it was not, for all the reasons discussed in this opinion, the entry and subsequent protective sweep were "close enough to the line of validity" of exigent circumstances.[91] Additionally, the protective sweep was limited to spaces where a person could be found and lasted no longer than necessary to dispel any concern of danger.[92] Second, the officers sought and executed the search warrant in good faith, based on the facts leading to the sweep and the discovery of firearms and loaded magazines during their prior protective sweep.

Accordingly, the warrant was based on lawful conduct and was sought and executed in good faith. The district court did not err by denying Turner's motion to suppress.

---

[87] *Id.* at 528.

[88] *Id.* (internal quotation marks omitted).

[89] *Id.*

[90] *Ante*, at 20–23.

[91] *Ante*, at 11–23.

[92] *Ante*, at 20–23.

No. 23-50461

V

Because there were exigent circumstances and the officers had probable cause, the officers' warrantless search of Turner's apartment was permissible. Additionally, the subsequent affidavit for the search warrant was not based on deliberately or recklessly false information or unlawfully obtained evidence. Accordingly, we AFFIRM the district court's denial of Turner's motions to suppress.